## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HUNTCO PAWN HOLDINGS, LLC, *et al.,*<br>Plaintiffs<br><br>v.<br><br>U.S. DEPARTMENT OF DEFENSE, *et al.*,<br>Defendants. | Civil Action No. 16-cv-1433 (CKK) |

## MEMORANDUM OPINION
(October 3, 2016)

In this case, Plaintiffs Huntco Pawn Holdings, LLC ("Huntco") and the National Pawnbrokers Association ("NPA") (collectively "Plaintiffs") challenge the decision of the United States Department of Defense ("Department") to amend a regulation that places certain limitations on the credit that can be extended to Military Service members and their dependents. The Department amended the regulation, which implements the Military Lending Act, 10 U.S.C. § 987 ("MLA"), to broaden the scope of the credit transactions that these limitations apply to and to amend a "safe harbor" the Department believed was being misused. Before the Court is Plaintiffs' [17] Motion for Preliminary Injunction. Plaintiffs ask the Court to enter an order enjoining the implementation of the regulation as it applies to pawnbrokers. In the alternative, Plaintiffs ask the Court to order that the previously available safe harbor be retained with respect to pawn transactions.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record for purposes of this motion, the Court DENIES Plaintiffs' [17] Motion for Preliminary Injunction.

---

[1] The Court's consideration has focused on the following documents:
- Pls.' Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 17;
- Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n"), ECF No. 24;
- Pls.' Reply in Support of Mot. for Prelim. Inj. ("Pls.' Reply"), ECF No. 26;

First, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits. The Court finds that the Department adequately responded to NPA's requests that pawnshops be exempted from the MLA or, in the alternative, that pawnshop-specific fees be exempted from the calculation of the permissible interest rate under that law. The Department's rulemaking also does not appear to have been arbitrary or capricious with regard to its decision to revise the safe harbor it had previously made available, or with respect to its certification under the Regulatory Flexibility Act ("RFA") that the new regulation would not have a significant economic impact on a substantial number of small entities. Finally, the Court is not persuaded that the signature block associated with the regulation in the Federal Register demonstrates that the regulation was issued in excess of statutory authority.

With respect to the other equitable factors the Court must consider in evaluating a motion for a preliminary injunction, the Court concludes that Plaintiffs have not demonstrated that they will suffer irreparable harm absent injunctive relief. The economic harms Plaintiffs claim will befall them are either applicable to only a very small subset of pawnshops' customers, highly speculative, insufficiently supported or contradicted by Plaintiffs' declarations. Finally, Plaintiffs have also not shown that the equities tip in their favor, or that the issuance of the requested injunction would be in the public interest. Accordingly, the Court determines that Plaintiffs have not met their burden of showing that a preliminary injunction is warranted.

## I.    BACKGROUND

This case revolves around regulations promulgated by the Department to implement the MLA. The Court accordingly provides a brief review of the relevant statutory and regulatory background as is necessary to resolve the pending Motion for Preliminary Injunction.

---

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

2

**A.  The Military Lending Act**

In 2006, the Department submitted a report to Congress regarding lending practices that it

concluded "undermine[ ] military readiness, harm[ ] the morale of troops and their families, and

add[ ] to the cost of fielding an all-volunteer fighting force."  DEPARTMENT OF DEFENSE, *Report*

*On Predatory Lending Practices Directed at Members of the Armed Forces and Their*

*Dependents* 53 (Aug. 9, 2006), http://archive.defense.gov/pubs/pdfs/Report_to_Congress_fin

al.pdf ("2006 Report").  The 2006 Report concluded that "[p]redatory lending practices are

prevalent and target military personnel," and recommended that Congress pass various

"protections against predatory lending to Service members."  *Id*. at 4, 45.  The 2006 Report

addressed three types of high-cost, short-term loans: "payday, car title, and tax refund

anticipation loans."  *Id*. at 4.

In response, Congress enacted the MLA.  The MLA prohibits extensions of "consumer

credit" to covered members of the Military and their dependents that "impose an annual

percentage rate of interest greater than 36 percent."  10 U.S.C. § 987(a)-(b).[2]  A lender who

violates the MLA is subject to civil liability, including actual damages, punitive damages and

costs.  *Id*. at § 987(f)(5).  "A person may not be held liable," however, "if the person shows by a

preponderance of the evidence that the violation was not intentional and resulted from a bona

---

[2] The MLA contains various other limitations and requirements applicable to loans to Service
members and their dependents.  Lenders are required to disclose, both orally and in writing,
before issuance of the credit, "[a] statement of the annual percentage rate of interest applicable to
the extension of credit," "[a]ny disclosures required under the Truth in Lending Act," and
"[a] clear description of the payment obligations of the member or dependent, as applicable."  10
U.S.C. § 987(c)(1).  The MLA also prohibits a number of specific lending practices, such as
"roll[ing] over, renew[ing], repay[ing], refinanc[ing], or consolidat[ing] any consumer credit
extended to the borrower by the same creditor with the proceeds of other credit extended to the
same covered member or a dependent," or "requir[ing] the borrower to submit to arbitration or
impos[ing] onerous legal notice provisions in the case of a dispute."  *Id*. at § 987(e).

fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such

error." *Id*. at § 987(f)(5)(D).  Violations are also punishable as misdemeanors, but only if a

creditor "knowingly violates" the statute.  *Id*. at § 987(f)(1).

Congress directed the Secretary of Defense to prescribe various regulations to "carry out"

the MLA.  *Id*. at § 987(h).  Among other things, the MLA states that these regulations "shall

establish" the following:

> (B) The method for calculating the applicable annual percentage rate
> of interest on such obligations, in accordance with the limit
> established under this section.
>
> (C) A maximum allowable amount of all fees, and the types of fees,
> associated with any such extension of credit . . .
>
> (D) Definitions of . . . "consumer credit" . . .
>
> (E) Such other criteria or limitations as the Secretary of Defense
> determines appropriate, consistent with the provisions of this
> section.

*Id*. at § 987(h)(2)(B)-(E).  In prescribing these regulations, Congress ordered the Department to

consult with the Federal Trade Commission, the Board of Governors of the Federal Reserve

System, the Office of the Comptroller of the Currency, the Federal Deposit Insurance

Corporation, the Bureau of Consumer Financial Protection, the National Credit Union

Administration and the Treasury Department.  *Id*. at § 987 (h)(3).

**B.  The Regulatory History**

**1.  The Department's Initial Regulations**

The Department first adopted regulations to implement the MLA in 2007.  *Limitations on*

*Terms of Consumer Credit Extended to Service Members and Dependents*, 72 Fed. Reg. 50580

(Aug. 31, 2007) (JA00016-30) ("2007 Rule").  Among other things, the 2007 Rule defined the

types of "consumer credit" transactions covered by the MLA, explained the types of costs

included in determining whether the Military Annual Percentage Rate ("MAPR") exceeded 36 percent, and provided a method lenders could use to identify covered borrowers.  JA00028-29.

First, the 2007 Rule defined "consumer credit" to include only the three particular types of short-term loans that were the focus of the 2006 Report: (1) payday loans, (2) vehicle title loans, and (3) tax refund anticipation loans.  JA00028.  Accordingly, under the 2007 Rule, the MLA only applied to these three types of loans.

Second, the 2007 Rule stated that the MAPR included, among other things, "interest, fees, credit service charges, [and] credit renewal charges," to the extent these costs were "required to be paid as a condition of the credit."  *Id.*

Third, the 2007 Rule provided a method for the "identification of a covered borrower." Lenders who obtained a certification from a borrower that the borrower was not a covered Service member, or the dependent thereof, were protected by a "safe harbor" from liability under the MLA ("Self-Certification Safe Harbor").[3]  JA00029.   The Department also provided two "optional verification procedures": (1) a lender could "but [was] not required to, verify the status of an applicant as a covered borrower by requesting the applicant to provide a current (previous month) military leave and earning statement, or a military identification card," or (2) the lender could, "but [was] not required to, verify the status of an applicant as a covered borrower by accessing the information available at http://www.dmdc.osd.mil/mla/owa/home.  Searches require[d] the service member's full name, Social Security number, and date of birth."  *Id.*  These

---

[3] The Self-Certification statement read, in relevant part, that "I AM NOT a regular or reserve member of the Army, Navy, Marine Corps, Air Force, or Coast Guard, serving on active duty under a call or order that does not specify a period of 30 days or fewer (or a dependent of such a member)."  JA00029.

methods were available to the lender, but did not provide a safe harbor from liability under the MLA.

### 2. The Department's Revised Regulations

#### a. Advanced Notice of Proposed Rulemaking

On June 17, 2013, the Department issued an Advanced Notice of Proposed Rulemaking "regarding enhancement of the protections that apply to consumer credit extended to members of the armed forces and their dependents." *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 78 Fed. Reg. 36134 (June 17, 2013) (JA00070) ("ANPR"). The Department requested "comment on the need to revise the Department's existing regulation that, in general, imposes certain limits on and requires certain disclosures relating to the provision of consumer credit to a covered borrower." *Id*.

The ANPR contained an excerpt from the Conference Report on a bill entitled National Defense Authorization Act for Fiscal Year 2013, which stated that "[t]he conferees recognize the progress the Department of Defense has made since consumer protections for military members and their dependents against predatory lending were enacted in the [MLA]." *Id*. The conferees noted that "[a] recent report by the Consumer Federation of America, The Military Lending Act Five Years Later, found that 'the law has been largely effective in curbing predatory . . . lending to covered borrowers." *Id*. However, it noted that the report also "found that many predatory lenders have modified their products to avoid coverage by the Department's rules implementing" the MLA. *Id*. The Conference Report suggested that the Department "review its regulations implementing [the MLA] to address changes in the industry and the evolution of lending products . . . ." *Id*.

On August 1, 2013, the Consumer Federation of America ("CFA"), in conjunction with other organizations, filed a public comment in response to the ANPR. JA00072. The comment suggested that the definition of "consumer credit" should be expanded to apply to all consumer credit regulated under the Truth in Lending Act ("TILA"). *Id.* Attached to this comment was a report prepared by the CFA on May 29, 2012, referenced in the ANPR, entitled The Military Lending Act Five Years Later: Impact on Service Members, the High-Cost Small Dollar Loan Market, and the Campaign Against Predatory Lending ("CFA Report"). The CFA Report found that the MLA had been "largely successful in curbing abusive lending" to the extent it took the form of the "three specific products" covered by the 2007 Rule, but that the "restrictive definitions of 'consumer credit' in [the Department's] rules left loopholes to be exploited." JA00096-97. It concluded that the definition of "covered credit" should be expanded to close these loopholes. JA00097-98. The CFA Report also stated that "[c]ounselors knew of cases where prohibited loans were still obtained," in part as a result of "falsified applications." JA00111.

### b. Notice of Proposed Rulemaking

On September 29, 2014, the Department issued a Notice of Proposed Rulemaking regarding proposed amendments to the 2007 Rule. *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 79 Fed. Reg. 58602 (Sept. 29, 2014) (JA00207-45) ("NPR"). Noting concerns regarding the "extremely narrow definition of 'consumer credit,'" JA00207, the Department proposed to amend its "existing regulation primarily for the purpose of extending the protections of the MLA to a broader range of . . . credit products," JA00206. "More specifically, the Department propose[d] to amend its regulation so that, in general, consumer credit covered under the MLA would be defined consistently with credit that for

decades has been subject to the protections under the Truth in Lending Act (TILA), namely: Credit offered or extended to a covered borrower primarily for personal, family, or household purpose, and that is (i) subject to a finance charge or (ii) payable by a written agreement in more than four installments." *Id*. This definition brought pawn loans within the scope of the MLA for the first time.

The Department also proposed revising the Self-Certification Safe Harbor. The Department stated that it had "become aware of misuses of the covered borrower identification statement whereby a Service member (or covered dependent) falsely declares that he or she is not a covered borrower," or "unwittingly incorrectly complete[s]" the statement," and stated that it believed the regulation should be revised to "relieve a Service member or his or dependent from making any statement regarding his or her status as a covered borrower." JA00218. The Department also proposed a new "conclusive mechanism" to determine whether an applicant was a covered borrower, whereby the lender would check the MLA Database to determine the consumer-applicant's status. *Id*. "If a creditor conducts a covered borrower check" through the MLA Database, the creditor "would be free from liability under the MLA" even if "that consumer, in fact, [was] a covered borrower." JA00219.

Finally, the Department "certifie[d] that this proposed regulation is not subject to the Regulatory Flexibility Act [ ] because the regulation, if adopted as proposed, would not have a significant impact on a substantial number of small entities." JA00239. The Department reasoned that "[w]hile a substantial portion of firms in each affected market are 'small business entities' Service members and their dependents make up only a small portion of the consumers for those businesses. Because only approximately 2.5 percent of households in the United States include an active duty Service member, the interest rate limits and other MLA conditions of the

proposed regulation would affect a small percentage of the consumers served . . . ." *Id.* The Department requested comments on these conclusions. *Id.*

### c.   Public Comments

#### i.   *The NPA's Public Comment*

On November 24, 2014, Plaintiff NPA submitted a public comment in response to the NPR. The NPA is a national trade association representing the interests of pawnbrokers. JA00246. In its comment, NPA explained the nature of pawn loans. When an individual brings an item to a pawnshop, he or she has essentially two options: to sell the item outright, or to pledge the item with the option to repurchase it after a period of time, plus a finance charge. JA00279 (public comment of EZCORP, another operator of pawnshops); JA00247-48. The latter option is referred to as a pawn loan. *Id.*

NPA advanced two major arguments in its public comment. First, NPA argued that the definition of "consumer credit" should not be expanded such that it would include pawn loans because pawn loans were different and less harmful to Service members than most other high-cost lending transactions. JA00247-49. One of the primary distinguishing features the NPA cited was the "non-recourse" nature of pawn loans. JA00248-49. In other words, the pawnbroker's only recourse in the event the consumer does not repay the loan is to retain, sell or otherwise dispose of the personal property left with the pawnshop. *Id.* The NPA also asserted that pawnbrokers do not usually run credit checks on potential borrowers, nor do they report their loan transactions to credit reporting agencies, which means that pawn loans generally do not directly affect the borrower's credit. JA00248; JA00256-57. Finally, NPA also argued that pawn loans are simple to understand, generate few complaints, and are already heavily regulated at the state and local level. JA00247-49.

Second, if the Department decided to apply the MLA to pawnbrokers, NPA argued that certain fees that pawnbrokers charged borrowers should be excluded from the calculation of the MAPR.  JA00251.  These included certain "pass-through fees" and taxes that pawnbrokers collect and remit to Government entities, storage charges, appraisal fees and insurance charges. JA00052-53.  For the most part, NPA argued that these fees should not be counted when calculating the MAPR because they are necessary incidents of pawn lending and "protect" both the pawnbroker and the consumer.[4]  *Id.*

## ii. The Office of Advocacy of the United States Small Business Administration's Public Comment

The Office of Advocacy of the United States Small Business Administration ("Advocacy") also submitted a public comment regarding the proposed rule.  Advocacy stated that it was "concerned about the factual basis for" the Department's certification that the Rule would not have a "significant economic impact on a substantial number of small entities." JA00288.  In particular, Advocacy argued that the assumption that "the proposed regulations would affect a small percentage of the consumers served by" small businesses because "only approximately 2.5 percent of households in the United States include an active duty Service member" did not take into account compliance costs associated with the revised safe harbor provision, because "[i]n order to benefit from the safe harbor, a business that offers financial credit products that exceed the 36 percent rate would need to check every applicant, not just members of the military and their dependents."  JA00289.  Advocacy also recommended "small

---

[4] On December 22, 2014, the NPA submitted a second public comment regarding the Proposed Rule.  In that comment, the NPA stated that it was "concerned that the Department may be persuaded to grant exemptions to depository institutions" but "not grant similar exemptions to pawnbrokers."  JA00291.  The NPA argued that this was not the "proper policy choice" because pawnbrokers are often supervised by the same agencies and subject to the same laws, and therefore equally deserving of exemption.  *Id.*

entities be allowed to continue to operate under a safe harbor that requires military members and their dependents to self-identify."  JA00290.

### d.  The Final Rule

The Department issued the final version of the Proposed Rule on July 22, 2015. *Limitations on Terms of Consumer Credit Extended to Service Members and Dependents*, 80 Fed. Reg. 43560 (July 22, 2015) (JA00458-510) ("Final Rule").  The Final Rule adopted the Proposed Rule's expanded definition of "consumer credit," determined that fixed fees should be included in the calculation of MAPR with narrow exceptions, and replaced the Self-Certification Safe Harbor with the revised safe harbor the Department had proposed based on lenders conducting covered-borrower checks through the MLA Database.  JA00505-07.   The Department also addressed Advocacy's concerns regarding the Final Rule's effects on small businesses, but still determined that the Rule would not have a "significant economic impact on a substantial number of small entities."  JA00502-04.

## C.  Plaintiffs' Allegations in this Case

The Final Rule went into effect on October 1, 2015, but compliance was not required until October 3, 2016.  Plaintiffs filed this lawsuit on June 12, 2016.  Complaint for Declaratory and Injunctive Relief, ECF No. 1.  Plaintiffs' Second Amended Complaint, which is the operative complaint for the purposes of this Motion,[5] asserts several causes of action for

---

[5] In their Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants argued that several of Plaintiffs' arguments were not properly before the Court because they were not included in Plaintiffs' Complaint.  *See, e.g.*, Defs.' Opp'n at 38.  Subsequently, Plaintiffs moved to file an amended complaint incorporating these arguments.  Pls.' Unopposed Mot. for Leave to File Second Amended Complaint, ECF No. 27.  Defendants did not oppose.  *Id.*  Accordingly, the Court granted Plaintiffs' motion.  Defendants have conceded that the filing of this amended complaint "means that claims raised for the first time in Plaintiffs' Memorandum in Support of their Motion for Preliminary Injunction . . . are now properly before the Court and ripe for decision in the context of Plaintiffs' Motion."  Defs.' Resp. to Min. Order, ECF No. 29 at 1.  The

violations of the Administrative Procedures Act ("APA") and the Regulatory Flexibility Act

("RFA").  Second Amended Complaint for Declaratory and Injunctive Relief ("Compl."), ECF

No. 27, Ex. A at ¶¶ 1, 114-53.  Specifically, Plaintiffs argue that Defendants violated the APA by

(1) failing to respond to comments requesting an exemption from the MLA for pawnbrokers, (2)

failing to respond to comments requesting that certain fees associated with pawn loans be

exempted from the calculation of MAPR, (3) failing to provide a rational explanation for, or

respond to comments about, revising the regulation's safe harbor provision, (4) failing to provide

a rational response to Advocacy's comments regarding the Department's RFA certification, and

(5) issuing the Final Rule in excess of statutory authority.  Compl. ¶ 14.

Plaintiffs filed the pending Motion for Preliminary Injunction on September 2, 2016,

asking the Court to enter an order enjoining application of the Final Rule to pawnbrokers.  Pls.'

Mot. at 43.  In the alternative, to the extent the Final Rule is applied to pawnbrokers, Plaintiffs

ask that the previously available Self-Certification Safe Harbor be retained as to pawnbrokers.

*Id.*  Plaintiffs requested a decision on this Motion by October 3, 2016, the date by which

compliance with the Final Rule is required.  *Id.*

## II.    LEGAL STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief.'"  *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see

also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an

---

Court accordingly considers all of the claims in Plaintiffs' Motion, regardless of whether they
appear in Plaintiffs' original Complaint.  However, the Court also takes into consideration
Defendants' argument that "it seems apparent these claims are an afterthought, and their addition
does nothing to moot Defendants' arguments that they present no issue of irreparable harm (and
lack any merit)."  *Id*. at 2.

extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.") (emphasis in original; quotation marks omitted). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (quoting *Winter*, 555 U.S. at 20) (alteration in original; quotation marks omitted)). "'When seeking a preliminary injunction, the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction.'" *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis*, 571 F.3d at 1291 (citation omitted). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291-92.

The Court notes that it is not clear whether this Circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the United States Court of Appeals for the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (concurring opinion)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In any event, this Court need not resolve the viability of the sliding-scale

approach today as the Court determines that "a preliminary injunction is not appropriate even under the less demanding sliding-scale analysis." *Sherley*, 644 F.3d at 393.

## III.   DISCUSSION

### A.  Plaintiffs Fail to Establish a Likelihood of Success on the Merits

Plaintiffs have not demonstrated a likelihood of success on the merits of their APA claims.  The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."  5 U.S.C. § 706(2).  The arbitrary and capricious standard "is a 'narrow' standard of review as courts defer to the agency's expertise." *Center for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 138 (D.D.C. 2012) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted).  However, the reviewing court "is not to substitute its judgment for that of the agency," *id.*, and a decision that is "of less than ideal clarity" may be upheld "if the agency's path may reasonably be discerned," *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

### 1.  The Department's Decision Not to Exempt Pawn Transactions From the Final Rule

Plaintiffs' first argument is that the Department's failure to completely exempt pawn

loans from the MLA was arbitrary and capricious because the Final Rule fails to address the

NPA's public comment requesting exemption.  Pls.' Mot. at 24-26.  The NPA's comments

argued in favor of pawn loans being exempted from the MLA because they were different than

the types of loans that caused readiness issues for Service members.  JA00247-49.  NPA argued

that pawn loans were less harmful because they were "non-recourse," already heavily regulated,

and not the source of a significant amount of consumer complaints.  *Id*.  Plaintiffs contend that

"[i]n promulgating the Final Rule, the Department provided no substantive response to NPA's

comments regarding the basis for continuing to exempt pawn transactions from the MLA."[6]

Pls.' Mot. at 25.

Defendants respond that the Department "addressed [NPA's] request in [its] broader

rejection of any exceptions."  Defs.' Opp'n at 38.  Defendants contend that "the Department

explicitly acknowledged that pawnbrokers were among the many types of financial institutions

requesting exemption from the MLA," and that the Department "may not have addressed at the

same length every point made by every type of financial institution about why its credit products

should be exempt, but that does not mean that the Department's explanation" did not sufficiently

respond to all requests for exemptions.  *Id*. at 39.

---

[6] Plaintiffs rely in part on the fact that the Consumer Financial Protection Bureau ("CFPB"), in its "recent proposed rulemaking" proposed "to exempt non-recourse pawn transactions from its small-dollar lending rules," in part because it believed "pawn transactions 'differ significantly from' other short-term consumer credit for many of the same reasons that NPA identified in its comments."  Pls.' Mot. at 25-26.  Plaintiffs assert that "[i]f the Department has a reason for disagreeing with CFPB over the need to regulate pawn transactions, it must explain what that reason is."  *Id*.  Plaintiffs cite no authority that would require the Department to explain a perceived difference between the Final Rule and another rule proposed by another agency. Although Plaintiffs are correct that the MLA requires the Department to "consult" with the CFPB, § 987(h)(3), the Department did so here.  The CFPB submitted a comment regarding the Final Rule and, far from suggesting pawn loans should be exempted, strongly supported the newly expanded definition of "consumer credit," JA00378, which all parties agree encompasses pawn loans.

The Department's failure to specifically discuss its rationale for denying pawn loans a special exemption from the Final Rule does not render the rule arbitrary or capricious.  Section 553 of the APA requires that an agency "shall give interested persons an opportunity to participate in the rule making" and, "[a]fter consideration of the relevant matter presented . . . shall incorporate in the rules adopted a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).  Although an agency "need not address every comment" made during the notice and comment period, "it must respond in a reasoned manner to those that raise significant problems."  *City of Waukesha v. EPA*, 320 F.3d 228, 257 (D.C. Cir. 2003) (quoting *Reytblatt v. Nuclear Regulatory Comm'n*, 105 F.3d 715, 722 (D.C. Cir. 1997)).  However, "[a]n agency's obligation to respond . . . is not 'particularly demanding.'"  *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (quoting *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)).  The agency's response to public comments need only "enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did."  *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335 (D.C. Cir. 1968).  "[T]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."  *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 876 (D.C. Cir. 1996) (citation & quotation omitted).

The record here does not demonstrate that the Department failed to consider the "relevant factors."  *Id*.  As the Department explained, the 2007 Rule's definition of "consumer credit" was crafted very narrowly to encompass only three specific types of loans.  JA00461.  In the NPR, the Department noted that this "extremely narrow definition of 'consumer credit' permit[ted] creditors to structure credit products in order to reduce or avoid altogether the obligation of the MLA."  JA00207.  Accordingly, in order to reach "a wider range of credit products," the

Department proposed to revise the definition of "consumer credit" to encompass *all* products

subject to TILA. *Id*.; JA00211. The Department also noted its belief that "aligning the key

aspects of the framework under the MLA" with TILA would "greatly facilitate a creditors'

ability to comply with the Department's Regulation." JA00214.

In response, the Department received hundreds of comments, "approximately 50" of

which were from various financial institutions requesting the Department adopt "an exemption

for certain types of creditors or, more narrowly, one or more exemptions for certain types of

credit products." JA00459. The Department expressly noted that pawnbrokers were among the

commenters requesting exemptions, stating that "[p]awnbrokers and their representatives explain

that traditional pawn transactions are different in kind from other types of credit transactions,

principally because a pawn transaction typically is a non-recourse loan, and should be exempt

from the scope of 'consumer credit' regulated under the MLA." JA00460.

The Department discussed these comments as a group. It explained in the Final Rule that

"many persons and entities urge the Department not to revise the scope of 'consumer credit' as

described in the Proposed Rule." JA00464. These persons urged the Department instead to use

a more "targeted" definition, "consistent with its previous approach." *Id*. They argued that the

definition should be crafted to cover only so-called "predatory" loan products, or products that

raised only certain types of risks. *Id*. As support for this narrower approach, the Department

explained that some commenters, like the NPA, argued that their loan products warranted

exemption because they were "valuable resources" to which Service members should continue to

have access. JA00460. Other commenters, again like the NPA, argued that their loan products

should be exempt because they are already heavily regulated and subject to "very high

compliance burdens." JA00466.

The Department rejected these commenters' requests for exemptions, or for a narrow definition of "consumer credit" generally, and provided a reasoned explanation. Addressing the "[m]any persons and entities" that believed "the Department should not" expand the definition of "consumer credit," the Department stated that "[i]n light of its assessment of the comments, its experience observing the effects of its existing regulation, and the scope and purposes of the provisions of [the MLA], the Department has determined that a wide range of credit products offered or extended to covered borrowers should be subject to the protections of the MLA." JA00461. The Department found this change necessary because "the narrow parameters of the credit products defined as 'consumer credit' under the existing rule do not effectively provide the protections intended to be afforded to Service members and their families under the MLA." JA00464.

In part, the Department reasoned that it "continues to believe that the extremely narrow definition of 'consumer credit' in the existing rule permits a creditor to structure its credit product in order to reduce or avoid altogether the obligations of the MLA." JA00465. It noted in particular a public comment submitted by forty U.S. Senators that urged the Department to widely expand the definition of "consumer credit" to close the "existing MLA loopholes." JA00464. The Senators asserted that creditors were able to evade the law by crafting loans that fell just barely outside the parameters of the definition of "consumer credit." *Id.* Accordingly, the Department concluded that a broad definition of "consumer credit" was necessary in order to prevent creditors from avoiding the MLA's coverage.

Responding to commenters' arguments that certain types of loans should be exempt because they were less dangerous or harmful than others, the Department explained that although "certain payday loans, vehicle title loans, and refund anticipation loans present the *most severe*

18

risks to Service members and their families," these types of loans did not pose the "only risks." JA00465.  The Department explained that commenters who, similarly to NPA, "urg[e] the Department to 'continue' to define the scope of the regulation" narrowly "miss the mark" because the original narrow definition was simply a result of the "short timetable" the Department had to issue an initial regulation.  *Id.*  As such, the Department had merely "elected to act judiciously by initially regulating only certain credit products that, at that time, the Department believed posed the most severe risks . . . ."  *Id.*  However, the Department reasoned, all "high cost loans" pose some "risks to covered borrowers."  *Id.*  Accordingly, the Department determined that, now, all such loans should be covered by the MLA.  *Id.*  This rationale applies with full force to pawn loans, which, despite the NPA's attempt to distinguish them in numerous ways from other types of harmful lending, are indisputably "high cost."  *See, e.g.*, Pls.' Mot., Ex. C (Decl. of Saul Frank) at ¶ 4 (discussing pawn loans subject to 240 percent APR).

By responding to requests for exemptions *generally*, and providing this reasoning for broadly expanding the scope of the regulation and not retaining a narrow definition of "consumer credit," the Department adequately addressed the NPA's specific request for exemption. Plaintiffs cite no authority requiring the Department to separately address each and every exemption requested, especially where approximately fifty such requests were made.[7]  Because

---

[7] None of the cases relied on by Plaintiffs stand for this proposition.  In *Ass'n of Private Sector Colls. & Univs.*, 681 F.3d at 449, the court concluded that the Department of Education failed to sufficiently respond to certain public comments.  Although the court noted that the Department of Education "grouped together related comments," *id.*, this was not the basis for its holding that the Department of Education's reasoning was arbitrary and capricious.  Instead, its holding was based on the conclusion that the Department of Education's response to one such "bundle" "misinterpreted" or otherwise ignored the commenters' concerns such that the Department of Education "never really answered the questions posed."  *Id.*  The court in *Delaware Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015), *as amended* (July 21, 2015), similarly determined that the EPA failed to address public comments sufficiently where its response misinterpreted or "refused to engage with" the commenters' concerns.  *Id.* at 15 ("EPA seems to

this lack of specificity does not "demonstrate that the agency's decision was not based on a consideration of the relevant factors," *City of Waukesha*, 320 F.3d at 258 (quotation omitted), it is not grounds for finding the Final Rule arbitrary or capricious.

   **2.   The Department's Decision to Not Exclude Fees and Costs Unique to Pawn Transactions From the Calculation of MAPR**

Plaintiffs' argument that the Final Rule is arbitrary and capricious because "the agency failed to consider whether significant pawn-specific fees and costs should be excluded from the calculation of MAPR," Pls.' Mot. at 26, fails for similar reasons.  As discussed above, in its comments on the Proposed Rule, NPA requested that the Department exclude certain "unique fees and costs from the calculation of MAPR."  JA00251-53.  Plaintiffs argue that the Department's failure to respond to these comments, even while it "considered requests from other creditors seeking to exclude certain fees from MAPR," renders the Final Rule arbitrary and capricious.  *Id*. at 27.

Defendants argue that many financial institutions made similar requests and the Department's general response and "discussion of why the MAPR calculation should include charges similar to those imposed by pawnbrokers . . . adequately address[ed] NPA's comments." Defs.' Mot. at 40.  Defendants contend that the Department's explanation was not "arbitrary and capricious" simply because it did not "walk through" the Department's rationale for why each of the specific fees listed in NPA's comment should not be excluded.  *Id*.

---

have missed the forest for the trees").  Finally, in *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011), the agency failed to address a letter from a commenter at all because of the commenter's failure to adhere to certain technical rules for submitting comments.  Here, unlike in those cases, the Court has determined that the Department's response *does* reasonably address NPA's request for exemption, just not as specifically as NPA desired.

Although a closer call, the Court finds that Plaintiffs have not met their burden of showing they are likely to succeed on this claim either.   The Department's discussion of whether fixed fees would be included in the calculation of MAPR, although not a model of clarity, sufficiently demonstrates the Department's reasoning for rejecting Plaintiffs' requests for specific fee exemptions.  The Department noted that "[m]any commenters urge the Department to modify the definition of consumer credit set forth in the Proposed Rule to accommodate schemes that many financial institutions use involving a fixed fee, commonly an 'application' or 'processing' fee, plus an interest-rate charge."  JA00467.  The Department provided an example of one such comment that argued, similar to NPA's argument, that such fees should not be included in the MAPR because to do so would render certain small-dollar lending transactions uneconomical.  *Id.*

The Department rejected these comments and gave a reasoned explanation for doing so. It reasoned that fees should be included in MAPR because "[s]imilarly to the way that a saver uses separate envelopes to allocate cash for different purposes (*e.g.*, groceries, fuel), a bank or credit union could split its revenue between fixed fees, periodic interest, and other charges."  *Id.* However, "from the perspective of the covered borrower who is the focus of the protection under the [MLA], the financial institutions' own apportionment of revenue among various 'fees' and 'interest' does not change the key fact that it is all part of an aggregate bundle of costs 'associated with the extension of credit.'"  *Id.*  The Department also stated that it "remain[ed] concerned that if an application fee or participation fee were to be excluded from the elements that must be included in the calculation of the MAPR . . . a creditor would have a strong incentive to evade the interest-rate limit by shifting the costs of a credit product by offering an interest rate below that limit and imposing (or increasing) one or more of those fees."  *Id.*; *see*

*also* JA00480 (concluding that exclusions would give creditors "a strong incentive to evade the interest-rate limit of [the MLA] by shifting the costs of a credit product by lowering the interest rate and imposing (or increasing) one or more of these excluded fees.").[8]

To the extent portions of this explanation dealt with specific fees raised by commenters other than the NPA (*e.g.*, an "application" fee as opposed to a "storage" or "insurance" fee), and accordingly were "of less than ideal clarity" as a response to NPA's particular request, the Court nonetheless upholds the Department's decision because its analytical "path may reasonably be discerned." *Pub. Citizen*, 988 F.2d at 196 (quoting *Bowman Transp.*, 419 U.S. at 286). The Department's reasoning makes clear that it determined that fixed fees should be included in the calculation of MAPR because they are part of the cost of lending from the Service member's perspective and because failing to exclude them would create an incentive on the part of lenders to shift the cost of lending away from the interest rate and toward exempt fees to avoid application of the MLA. These explanations appear to apply fully to the specific types of fees for which NPA sought exemption, and the Department was not required to apply this reasoning separately for each specific type of fee for which a commenter requested an exemption.

The Court's conclusion is not changed by the Department's granting of exemptions for certain fees requested by other commenters. Noting exemptions given for fees associated with insured depository institutions and credit cards, Pls.' Mot. at 27, Plaintiffs argue that "if there is an 'analytical path' to be discerned, it is that a particular fee should be excluded from the MAPR if including the fee will drastically change the terms of the product and will require the creditor

---

[8] The Department also acknowledged, and the Court finds significant, that including all fees in the calculation of MAPR "reasonably interprets the definition of 'interest' in the MLA, which generally . . . must include '*all* cost elements associated with the extension of credit, including *fees* . . . .'" JA00479 (emphasis added).

to make significant changes to the product," Pls.' Reply at 6.  Following this "analytical path," Plaintiffs contend, leads to the conclusion that pawn loans should be exempted.

The Court disagrees with Plaintiffs' interpretation of the Department's "analytical path." First, the exception given for an "application fee charged by a federal credit union or insured depository institution when making a qualifying closed-end loan" was expressly based on a perceived conflict between the inclusion of that fee in the MAPR and another federal law. JA00468.  No such conflict is at issue with regard to the pawn-specific fees.  Second, although the Department did note that inclusion of certain credit card fees in the MAPR would require significant changes to credit card products, the exception given for these fees was based on the Department's finding that "unlike the vast majority of credit products that are amenable to straightforward pricing mechanisms relating to the cost of the funds borrowed (such as solely on the basis of a fixed or variable interest rate applied for a term or on a period basis or, as discussed above, a combination of an 'application' fee and a periodic rate), credit produced through a credit card account can be provided subject to a pricing mechanism that, in part, accounts for the value of products or services delivered through the cardholder's use of the card itself."  JA00470.  It was based on these special characteristics, which do not apply to pawn loans, that the Department agreed to provide exceptions for certain credit card fees, such as foreign transaction fees.  *Id.*  It was reasonable for the Department to conclude that these unique characteristics warranted treating credit cards differently than the "vast majority," *id.*, of other credit products, and the Department's reasoning does not demand that the same result be reached for pawn loans.

In sum, the explanations provided by the Department for including fixed fees in the MAPR, as well as the Department's explanations for the narrow exceptions it granted from this

general rule, sufficiently explain why the Department decided to include the pawnbroker-specific

fees in the calculation of MAPR.  As with the Department's decision not to expressly explain

why pawn loans were among the many types of loans that were not being given a complete

exemption from the Final Rule, the Department's decision not to expressly explain why each

specific fee associated with pawn loans were among the many types of fees that were to be

counted toward the MAPR did not "demonstrate[ ] that the agency's decision was not based on a

consideration of the relevant factors."  *City of Waukesha*, 320 F.3d at 257-58.  It accordingly

does not render the Final Rule arbitrary or capricious.

### 3.   The Department's Decision to Remove the Self-Certification Safe Harbor

Plaintiffs also argue that the Department's decision to eliminate the Self-Certification

Safe Harbor was arbitrary and capricious for three reasons.  Plaintiffs argue that the Department

(a) failed to provide a "rational explanation" for eliminating the safe harbor, (b) failed to provide

the data upon which it based its decision to eliminate the safe harbor and (c) failed to address

public comments regarding the impact of the safe harbor on the dissemination of Social Security

numbers.

#### a.   Failure to Provide a "Rational Explanation" for Eliminating the Self-Certification Safe Harbor

Plaintiffs' first argument regarding the elimination of the Self-Certification Safe Harbor

is that the rationale provided by the Department for doing so is unsatisfactory.  Plaintiffs argue

that the Department's "sparse explanation" that the Self-Certification Safe Harbor was being

misused was insufficient because it has no "basis in the record" and is not supported by data.  *Id.*

at 28-29.

Defendants respond that the Department "reasonably explained its modification of the

safe harbor provision" by explaining its concern regarding misuse of self-certifications.  Defs.'

Mot. at 43-44.  Defendants also argue that the Department provided a separate, although related, explanation for modifying the safe harbor: "reliev[ing] a Service member or his or her dependent from making any statement regarding his or her status as a covered borrower in the course of a transaction involving consumer credit."  *Id.*  To the extent these rationales were not supported by "empirical data," Defendants contend that lack of such data is not grounds for setting aside a rule in instances where, like here, such data cannot be readily obtained.  *Id.* at 44-45.

As an initial matter, the Court is not persuaded by Plaintiffs' argument that the Department failed to provide a "rational explanation" for its modification of the safe harbor.  In its NPR, the Department highlighted a serious problem with the Self-Certification Safe Harbor: "misuses of the covered borrower identification statement whereby a Service member (or covered dependent) falsely declares that he or she is not a covered borrower," either "on his or her own initiative or complicit with the creditor" in order to obtain a "credit product unencumbered by the interest rate limit and other restrictions of the MLA."  JA00218.  In the Final Rule, the Department stated that it was removing the Self-Certification Safe Harbor in part because it "continues to believe that the dynamic between creditors and borrowers in actual transactions has led to widespread misuse of the individuals' self-certification statements, which also have resulted in adverse effects on Service members or their dependents who make false statements."  JA00474.

Relatedly, the Department explained that it believed that modifying the safe harbor to incorporate a covered-borrower check was preferable because it would shift the burden of determining compliance with the MLA to lenders, who, the Court notes, are the actual subjects of the law.  The Department stated that the "safe-harbor provision [was] designed to relieve a Service member or his or her dependent from making any statement regarding his or her status as

25

a covered borrower in the course of a transaction involving consumer credit." *Id.*; *see also* JA00458 (stating that new safe harbor was preferable because "a Service member or his or her dependent would be relieved from making any statement regarding his or her status as a covered borrower"). At a minimum, the Court finds these explanations sufficiently "rational" for the purposes of its "highly deferential" review under the APA. *Am. Trucking Associations, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013). [9]

The Court also rejects Plaintiffs' contention that the Department was required to rely on technical data to support these explanations. As both parties acknowledge, agencies are not required to rely on such data where it cannot "readily be obtained." *BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 203 (D.C. Cir. 2009) (quoting *Fox*, 556 U.S. at 519 (holding that "[i]t is one thing to set aside agency action under the Administrative Procedure Act because of failure to adduce empirical data that can readily be obtained . . . . It is something else to insist upon obtaining the unobtainable.") (citation omitted)). Although Plaintiffs make a cursory argument that evidence regarding the misuse of self-certifications is "hardly among 'some propositions for which scant empirical evidence can be marshalled,'" Pls.' Reply at 9 n.6 (quoting *Fox*, 556 U.S. at 519), the Court finds the exact opposite true. Those complicit in falsifying the self-

---

[9] Plaintiffs acknowledge that the Department also justified revising the safe harbor in part by stating that the MLA Database would be more "straightforward" because it was "akin to the unilateral process a creditor currently uses to obtain a consumer report when assessing the creditworthiness of a consumer and to ascertain the consumer's identity," Pls.' Mot. at 30. However, Plaintiffs argue that this rationale does not apply to justify changing the safe harbor with respect to pawn lenders, who, Plaintiffs assert, do not already regularly run credit checks. *Id.* The Court agrees that this rationale may not support revising the safe harbor with respect to every type of lender covered by the MLA. However, other explanations offered by the Department, including its concern regarding misuse of certifications and its desire to shift the burden of identifying covered borrowers to the lender, do apply broadly. The fact that one aspect of the Department's explanation applies to only a subset of lenders does not render the remainder arbitrary or capricious.

certification forms, which were printed with warnings that stated that "[k]nowingly making a false statement on a credit application is a crime," JA00029, are not likely to report such information.  *See BNSF*, 566 F.3d at 203 (holding that agency was not required to have "statistics on the rates of" cheating on drug tests because "[a]s any successful use of cheating devices would not show up in statistics, the Department reasoned, it was 'illogical' to require statistical evidence of cheating").  And those who mistakenly fill out the forms incorrectly are presumably unaware of their error.  The Department was accordingly not required to support its belief that such misuse was occurring with any technical data.

Finally, contrary to Plaintiffs' contention, anecdotal evidence of misuse was present in the record.  As Defendants point out, the CFA Report submitted to the Department stated that "[c]ounselors knew of cases where prohibited loans were [ ] obtained," in part as a result of "falsified applications."  JA00111.  In a separate comment, a group of trade associations highlighted CFA's finding that "spouses [were] falsifying information" on certifications. JA00195.  The CFA Report was referenced by the Department in the ANPR, JA00070, the NPR, *see, e.g.*, JA00213, and the Final Rule, *see, e.g.*, JA00498.  Admittedly, even considering the CFA Report's finding, the evidence of such misuses in the record was not particularly fulsome. However, as discussed above, the Court accepts that evidence of misuse is difficult to obtain and, as Defendants point out, "NPA identifie[d] no comment that provided" countervailing evidence that rebutted the Department's belief.  Defs.' Opp'n at 46.  In this situation, the Court finds it appropriate to "defer to the agency's expertise," *Center for Food Safety*, 898 F. Supp. 2d at 138, regarding the "dynamic between creditors" and its own Service members under a regulation it has been implementing since 2007.[10]  Accordingly, Plaintiffs have not demonstrated that the

---

[10] Although Plaintiffs concede that the Department cites to the CFA Report at numerous points

Department's explanation for removing the Self-Certification Safe Harbor was arbitrary or capricious.

### b. Failure to Provide Data Upon Which the Department Relied in Eliminating the Self-Certification Self Harbor

Plaintiffs next argue that "[e]ven assuming that the Department relied on some data to support its elimination of the self-certification safe harbor, its decision still cannot stand," because the Department disclosed no such data to the public. Pls.' Mot. at 30.

Defendants respond that "[a]lthough the D.C. Circuit has in some circumstances required an agency to make available for public comment 'technical studies and data' on which the agency relies in promulgating a rule, that doctrine has no application where the agency does not rely on such information." *Id*. at 47 (quoting *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236, 240 (D.C. Cir. 2008)). Defendants argue that they relied on anecdotal evidence in deciding to modify the safe harbor and accordingly had no obligation to provide data. *Id*. at 48.

Plaintiffs concede that this argument is only relevant if the Department in fact relied on data that it did not divulge to support its decision to eliminate the Self-Certification Safe Harbor. Pls.' Mot. at 31; Pls.' Reply at 10. This argument is accordingly mooted by Defendants'

---

throughout the Proposed Rule and the Final Rule, Plaintiffs fault the Department for not citing the Report in the particular section of the Final Rule where it discusses falsification of self-certifications. Pls.' Reply at 9. As such, Plaintiffs argue, the Department is precluded from relying on the evidence within the Report because "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50. This rule is not applicable here, however, because the "basis articulated by the agency" for removing the safe harbor in the NPR and the Final Rule was that it was being misused by lenders and Service members, and that the Service members should be relieved from the burden of representing their own status. JA00218; JA00474. These same bases are advanced by the Department in this litigation. Although the Report was not cited as support for this particular proposition in the Final Rule, the Court must "accept the [Department's] 'findings of fact so long as they are supported by substantial evidence on the record *as a whole*.'" *Great Lakes Comnet, Inc. v. FCC*, 823 F.3d 998, 1002 (D.C. Cir. 2016) (emphasis added) (citation omitted).

assertion that the Department did not rely on any such data. *See Conference of State Bank Supervisors v. Office of Thrift Supervision*, 792 F. Supp. 837, 843 (D.D.C. 1992) ("While the court recognizes that under some circumstances agencies must identify the specific studies or data that they rely upon in arriving at their decision, the court finds that the present case is not one of those circumstances" because the Office of Thrift Supervision "did not rely upon any particular studies or data" but instead "relied upon its expertise and knowledge of the industry.").

### c. Failure to Respond to Significant Public Comments on the Impact of Eliminating the Self-Certification Self Harbor

Plaintiffs' final argument with respect to the Department's decision to eliminate the Self-Certification Safe Harbor is that the decision was arbitrary and capricious because the Department "ignored NPA's comments relating to the use of Social Security Numbers to access the MLA Database." Pls.' Mot. at 31. Plaintiffs claim that NPA's public comment raised the issue that the new safe harbor would increase the "dissemination of Social Security Numbers" and therefore the "possibility of identity theft and data security risks to Service members and their dependents." *Id.* at 32. Plaintiffs argue that the Final Rule is arbitrary and capricious because "[t]he Department's discussion of the Final Rule makes no mention of NPA's comment about Social Security numbers, the growing privacy policy discussed therein, or even the MLA Database's use of Service members' Social Security Numbers." *Id*.

Defendants contend that Plaintiffs mischaracterize NPA's comment. Defs.' Opp'n at 48. Defendants argue that "NPA made those comments as part of its response to a question in the NPRM about whether the safe harbor should be available not only to creditors using the MLA Database but also to creditors using a commercially available product that relies on data from the MLA Database." *Id*. "Because NPA itself did not frame its concerns about the use of [Social Security numbers] as a reason not to retain the old safe harbor," Defendants argue, "it is not

surprising that the Department did not explicitly mention [Social Security numbers] in explaining its decision." *Id*.

Plaintiffs are unlikely to succeed on this claim because it appears NPA did not meaningfully pose this issue to the Department. Although perhaps Defendants characterize NPA's comments regarding Social Security numbers too narrowly, Plaintiffs also mischaracterize NPA's comments by suggesting that the group "opposed the revised safe harbor" due to "privacy policy" interests and the "expansion in the dissemination of Social Security Numbers." Pls.' Mot. at 32. Instead, references to Social Security numbers and privacy interests in NPA's comment were primarily made in the context of explaining the compliance costs pawnbrokers would face in conducting covered-borrower checks through the MLA Database and arguing that an additional commercial database should not be used.

In its comment, NPA stated that "[o]ne of the most complicated aspects of requiring creditors to conduct a covered-borrower check is the necessity of having the applicant's Social Security Number in order to obtain a report from the MLA Database." JA00257. It explained that "[p]awnbrokers are not required to obtain the consumer's Social Security Number in most jurisdictions due to rising concerns about identity theft and increased liability for data security breaches generally." *Id*. Accordingly, "in jurisdictions that do not require collection of the Social Security Number, and particularly in those that forbid its capture," the NPA argued that "any requirement to conduct a covered-borrower check that relies on the Social Security Number will impose significant compliance problems for pawnbrokers." *Id*.

Granted, NPA's comment made references to "data security breaches" and the "possibility of identity theft and data security risks to Service members and their dependents" associated with covered-borrower checks. JA00257-58. But, as Defendants point out, searches

on the MLA Database already required the borrower's Social Security numbers under the 2007

Rule.  Defs.' Opp'n at 49.  NPA did not ask the Department to revise that Database such that it

did not require Social Security numbers, nor did it ask the Department to retain the Self-

Certification Safe Harbor in the Final Rule because of the privacy implications for Service

members.[11]  In fact, NPA advised the Department that the "MLA Database works well."

JA00258.  Read in context, NPA was simply arguing that it would experience compliance costs

from using the database because pawnshops do not already obtain Social Security numbers.

Accordingly, the Court will not fault the Department for not engaging in a broader discussion of

the "implications of the new safe harbor's use of Social Security Numbers," or the "growing

privacy policy" issues surrounding the use of such information, when that was not the actual

focus of NPA's comment.

### 4.  The Department's Certification of No Significant Impact on a Substantial Number of Small Businesses

Next, Plaintiffs argue that the Department's certification that the Final Rule would not

have a "significant economic impact on a substantial number of small entities," was arbitrary and

capricious for a variety of reasons.  Pls.' Mot. at 32-33.  First, Plaintiffs argue that "the

Department did not consider any costs to pawnbrokers in its RFA analysis," because the

Department did not include the North American Industry Classification ("NAIC") code for

pawnbrokers in the list of codes the Department stated that it had considered.  *Id*. at 34.  Second,

Plaintiffs argue that the Department did not adequately address either Advocacy's public

comments regarding deficiencies in the RFA certification in the Department's NPR, or

---

[11] Implicitly recognizing this flaw in their argument, Plaintiffs contend in their Reply that "Plaintiffs can challenge elimination of the self-certification safe harbor based on comments submitted by others."  Pls.' Reply at 11.  But Plaintiffs do not point the Court to any comments that asked the Department to engage in the sort of discussion about Social Security numbers Plaintiffs now argue was required.

Advocacy's suggestion that the Department retain the Self-Certification Safe Harbor for small businesses. *Id*. at 34-35.  Finally, Plaintiffs argue that the Department "improperly refused to address" the impact of the Final Rule on small businesses depending on their specific geographic location, as opposed to "across the nation as a whole." *Id*. at 35-36.

Defendants respond that the Department did consider the costs to pawnbrokers in its RFA analysis, Defs.' Opp'n at 50, and that Plaintiffs' argument regarding the Department's failure to reference the NAIC code for pawnbrokers fails because it is waived, as it was not raised during the rulemaking process, and because it is irrelevant, *id*. at 51.  Defendants also argue that the Department addressed Advocacy's comments and suggestions, *id*. at 52-54, and that Plaintiffs' argument that the Department should have considered the particular location of small businesses when analyzing the impact of the Final Rule was not raised during the rulemaking process and is therefore waived, *id*. at 54-55.  Regardless, Defendants argue, such analysis was not required. *Id*. at 55.

First, the Court finds that Plaintiffs cannot succeed on several of these arguments because they were not presented to the Department during the rulemaking process.  "[A] party will normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first presented to the agency for its initial consideration." *Advocates for Highway & Auto Safety v. Federal Motor Carrier Safety Admin.*, 429 F.3d 1136, 1150 (D.C. Cir. 2005).  Here, Plaintiffs fault the Department for not considering the Final Rule's effect on pawnshops based on the fact that the list of "affected businesses" in the Final Rule does not include the NAIC code for pawnbrokers.  However, the Department's NPR included the exact same list of "affected business[ ]" codes as was ultimately included in the Final Rule, *compare* JA00239 *with* JA00502, and NPA never raised this issue to the Department.  This argument is accordingly

waived.[12]  *See National Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002),

*supplemented sub nom. In re Kagan*, 351 F.3d 1157 (D.C. Cir. 2003) (declining "to reach the

merits of [plaintiff's] cost estimate challenges because neither [plaintiff] nor any other party

before the agency raised any of these contentions during the administrative phase of the

rulemaking process").

       Similarly waived is Plaintiffs' contention that the Department's RFA certification is

improper because it did not consider the different impact the Final Rule would have on small

businesses depending on their particular geographic location.  Plaintiffs argue that "commenters

did address the obvious fact that the rule would have greater impact in military communities,"

but point to no comments that suggested the Department conduct its RFA analysis "depending on

whether a business is located near a military base." Pls.' Reply at 14.  Because the Department

was not given the opportunity to address this claimed deficiency during the rulemaking process,

the Court will not entertain it now.  *See Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013)

(argument that the "Secretary never determined that the treatment rule is 'the only practical

means of advancing the interests of the producers'" as required by statute was waived because

"the Secretary never considered whether an 'only practical means' determination was necessary

for one simple reason: no one suggested during the rulemaking that such a determination was

required"); *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 12 (D.C. Cir. 2011) (argument that the

---

[12] To the extent Plaintiffs argue in their Reply that, in addition to the absence of this NAIC code, Plaintiffs can alternatively demonstrate that the Department failed to consider the effect on pawnshops based on the fact that in the Final Rule the Department only "pointed to" a single "one-time cost to certain pawnbrokers and ignored all the other compliance costs raised as to all pawn transactions," Pls.' Reply at 13, this claim has no merit.  The reference to this cost was clearly designated as an "example," JA00495; JA00503, and does not suggest the Department did not consider any other costs to pawnbrokers.  If anything, that the one example of such costs to small businesses the Department provided highlighted pawnshops in particular indicates that the Department *did* consider costs to pawnbrokers in its analysis.

"EPA's regulatory flexibility analysis was arbitrary and capricious in failing to consider the costs of complying with the state conditions that the final VGP would impose" was waived because "petitioners did not object to that omission below, notwithstanding that it was clear from the analysis that accompanied the draft VGP that EPA did not plan to consider such costs").

Plaintiffs' arguments that the Department did not respond to Advocacy's comments, although not waived, will likely fail on the merits. The RFA's "requirements are '[p]urely procedural.'" *Nat'l Tel. Co-op. Ass'n v. F.C.C.*, 563 F.3d 536, 540 (D.C. Cir. 2009) (quoting *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001)). "Though it directs agencies to state, summarize, and describe, the Act in and of itself imposes no substantive constraint on agency decisionmaking." *Id.* "The standard of review is the same as that under the APA, in that [the] court reviews the [Department's certification] for arbitrary and capricious action." *Nat'l Coal. For Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 142 (D.D.C. 2002).

As Plaintiffs note, Advocacy challenged the Department's estimate of the impact of the Rule on small businesses because, in the NPR, that estimate relied on the assumption that "only approximately 2.5 percent of households in the United States include an active duty Service member." JA00239. Advocacy argued that that assumption was flawed because it did not take into consideration the costs of complying with the revised safe harbor provision. JA00289. The Department's assumption did not apply to those costs, Advocacy argued, because "[i]n order to benefit from the safe harbor, a business that offers financial credit products that exceed the 36 percent rate would need to check every applicant, not just members of the military and their dependents." *Id*.

Contrary to Plaintiffs' assertion, the Department directly addressed this comment and revised its RFA certification analysis accordingly. As an initial matter, the Department noted

34

that it disagreed with Advocacy that any business was required to conduct a covered-borrower

check. JA00503. Nonetheless, it stated that it had "assume[d] that all creditors . . . will establish

a procedure to determine whether a particular customer is a covered borrower." *Id.* ("assuming

that each of the approximately 37,500 creditors subject to the regulation establishes a process to

conduct covered-borrower checks through a method provided in § 232.5(b) . . ."). With that

assumption in mind, the Department estimated the compliance costs small businesses might face

as a result of the revised safe harbor. *Id.* Based on these estimates, the Department concluded

that the "cost for each business of updating systems or procedures to use a method for

conducting covered-borrower checks described in § 232.5(b) (if the business were to do so) is

not substantial."[13] JA00504. The Court finds that this satisfies the RFA's "'[p]urely

procedural'" requirements. *Nat'l Tel. Co-op.*, 563 F.3d at 540 (quoting *U.S. Cellular Corp.*, 254

F.3d at 88).

Finally, the Final Rule also provided a sufficient response to Advocacy's suggestion that

small businesses be allowed to continue to use the Self-Certification Safe Harbor. Advocacy

raised a concern regarding small business' resources to comply with the Proposed Rule's safe

harbor provision and stated that "[t]o mitigate the economic impact on small entities, Advocacy

recommends that small entities be allowed to continue to operate under a safe harbor that

requires military members and their dependents to self-identify." JA00290. As discussed above,

the Department responded to Advocacy's concerns regarding the impact on small businesses. It

---

[13] Although the Department also reiterated that "[b]ecause only approximately 2.5 percent of households in the United States include an active duty Service member, the interest-rate limit and other MLA conditions of the final rule would affect a small percentage of the consumers served by entities that could be creditors covered by this final rule," JA00503, Advocacy only challenged this rationale as it applied to the revised safe harbor provision. This rationale was never challenged, and is reasonable, as it applies to the "interest-rate limit and other MLA conditions." *Id.*

explained that small businesses, like all businesses, were not required to conduct covered-borrower checks.  JA00503.  Moreover, even assuming creditors would conduct some type of covered-borrower check, the Department still found that the impact of the revised safe harbor provision on small businesses was "not substantial."  JA00504.  Implicit in this determination is the Department's response that small businesses need not be given any special exemption from the Final Rule's safe harbor provision.  Nonetheless, the Department also granted the relief Advocacy requested in part, by giving all lenders one year during which they could continue to rely on the Self-Certification Safe Harbor.  JA00459.  Plaintiffs appear to essentially argue that the Department's decision was wrong, and that it should have accepted Advocacy's suggestion in full, Pls.' Reply at 15, but it is not the Court's role to make that determination.  *Texas Mun. Power Agency*, 89 F.3d at 876 ("The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.").

### 5.  The Department's Statutory Authority to Issue the Final Rule

Finally, Plaintiffs argue that the Final Rule was issued in excess of statutory authority because "there is no indication that the MLA regulations were promulgated by an employee with authority to do so."  Pls.' Mot. at 36-37.  Specifically, Plaintiffs complain that "[t]he regulations are not signed by the Secretary of Defense; the published Final Rule contains the signature block of an employee whose title is 'Federal Register Liaison Officer.'"  *Id.* at 37.

Defendants respond that "[t]he 2015 Rule was properly promulgated by the Office of the Under Secretary of Defense for Personnel and Readiness . . . which the Secretary of Defense has designated to perform that function."  Defs.' Opp'n at 56.  Although Defendants contend that Plaintiffs' focus on the "signature block" is misplaced, "out of an abundance of caution," Defendants also attached to their Opposition an affirmance and ratification of the Rule by the

Acting Under Secretary.  *Id*. at 58.

Plaintiffs' argument is likely to fail for a number of reasons.  First, it is important to clarify what Plaintiffs are actually arguing.  In their Reply, Plaintiffs do not dispute that the Secretary of Defense may delegate his rulemaking authority, nor do they dispute Defendants' showing that the Secretary did in fact delegate that authority to the Under Secretary for Personnel and Readiness with respect to the Final Rule.  Pls.' Reply at 16-17 ("the only official to whom rulemaking authority had been delegated" is the "Undersecretary for Personnel and Readiness").  Instead, Plaintiffs' argument is that the Under Secretary was "not involved in" or did not "actually issue the rule."  *Id*. at 16.  That argument, in turn, is based on Plaintiffs' claim that "neither [the Under Secretary] nor anyone from his office purported to sign" the Final Rule. *Id*.

Plaintiffs read too much into the signature block in the Federal Register.  Plaintiffs are correct that the individual who signed the Final Rule was Patricia L. Toppings, the "OSD Federal Register Liaison Officer" ("FRLO").  JA00510.  Defendants do not dispute that the FRLO "caused the Rule to be published in the Federal Register."  Defs.' Opp'n at 58.  The Court takes notice of public documents that indicate that an FRLO is simply the "main point of contact" between the Department and the Office of the Federal Register who "serve[s] as the Authorizing and Certifying Official for authenticity of documents and funding," reviews documents for "adherence to Federal Register standards," and submits documents to the Federal Register for publication.[14]  Public Department documents indicate that the Department has adopted a system whereby regulations to be published in the Federal Register are first forwarded to FRLOs for

---

[14] *DoD Regulatory Program Contact Information*, U.S. Dep't of Defense, http://www.dtic.mil/whs/directives/infomgt/regulatory/contact.htm (last visited Sept. 29, 2016).

these purely ministerial purposes.[15]  Although the Department appears to have followed this

same procedure when publishing the 2007 Rule, the ANPR and the NPR, JA00016; JA00070;

JA00206, Plaintiffs point to no comment during the rulemaking proceedings that suggested this

was an issue.  *See Advocates for Highway & Auto Safety*, 429 F.3d at 1150 ("[A] party will

normally forfeit an opportunity to challenge an agency rulemaking on a ground that was not first

presented to the agency for its initial consideration.").

      For the purposes of this motion, it suffices to say that Plaintiffs have no evidence that the

Under Secretary was "not involved in the rulemaking," Pls.' Reply at 17, and the record cannot

reasonably be read as indicating such a lack of involvement based solely on the fact that the

signature block in the Federal Register was that of an FRLO.  As Plaintiffs acknowledge, the

beginning of the Federal Register entry for the Final Rule states that the agency promulgating the

Rule is the "Office of the Under Secretary of Defense for Personnel and Readiness, Department

of Defense."  JA00458.  Moreover, the content of the Final Rule makes abundantly clear that it

was the "the Department of Defense," not the FRLO, that decided to "amend its regulation that

implements the Military Lending Act," JA00458, that "consulted with" various Federal agencies

regarding the regulation, *id*., that "posed a series of questions" to the public in the NPR,

JA00460, that "quantified [the] effects of the regulation," *id*., that considered public comments

on the regulation, JA00461, and that made findings and conclusions about those comments,

JA00465.  In the end, the Final Rule explicitly states that it was "issued by the Department."

JA00504.

      Nor have Plaintiffs pointed the Court to any authority that suggests that a regulation is

---

[15] *The OSD Federal Register Process*, U.S. Dep't of Defense, http://open.defense.gov/Reg
ulatory-Program/Process/OSDFederalRegisterProcess/ (last visited Sept. 29, 2016).

invalid unless signed in the Federal Register by a particular person.  Indeed, the Court notes that

the Hand Book the Federal Register offers to agencies regarding publication requirements itself

states that "[y]our agency determines who may sign a document submitted for publication in the

*Federal Register*."[16]  Here, the Department determined that documents would be signed by

FRLOs.[17]

       Finally, any doubt about whether this rule was issued under proper authority is resolved

by the signed letter from the Acting Under Secretary of Defense that notes that "[t]he authority

under which the Final Rule was issued has been questioned in litigation," and states that "[t]o

resolve these questions, and in an abundance of caution, I state that I have become familiar with

the contents of the Final Rule, and I hereby affirm and ratify the Final Rule as it was published in

the Federal Register."  JA00513.  The Court interprets this statement as the Under Secretary

confirming that what the FRLO transmitted to the Federal Register for publication accurately

reflects the policy decisions his office made regarding the promulgation of the Final Rule.

Accordingly, there is no longer any serious dispute that the Final Rule, as published, reflects the

decisions of the agency with authority to promulgate it.  The Court therefore does not find it

likely that Plaintiffs will succeed in showing that the Final Rule was issued in "excess of

statutory authority."  *See State Nat'l Bank of Big Spring v. Lew*, No. CV 12-1032 (ESH), 2016

WL 3812637, at *4 (D.D.C. July 12, 2016) (noting that one factor in support of finding a ratified

agency action valid is that "forcing the [agency] to start the administrative process over would be

---

[16] Nat'l Archives and Records Admin., Office of the Federal Register, *Federal Register Document Drafting Handbook* 2-47 (Oct. 1998), https://www.archives.gov/federal-register/write/handbook/ddh.pdf.

[17] *The OSD Federal Register Process*, U.S. Dep't of Defense, http://open.defense.gov/Regulatory-Program/Process/OSDFederalRegisterProcess/ (last visited Sept. 29, 2016) ("After publication approval, the FRLO signs the rule and forwards it to the Federal Register for publication.").

fruitless, because 'it is virtually inconceivable that its decisions would differ in any way the second time from that which occurred the first time'") (quoting *Fed. Election Comm'n v. Legi-Tech, Inc.*, 75 F.3d 704, 708 (D.C. Cir. 1996)).

## B.  Plaintiffs Fail to Show Irreparable Injury

To show that a preliminary injunction is warranted, Plaintiffs must also demonstrate that there is a likelihood they will suffer irreparable harm in the absence of injunctive relief.  *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief.").  The Court of Appeals for the D.C. Circuit "has set a high standard for irreparable injury."  *Id.*  "First, the injury 'must be both certain and great; it must be actual and not theoretical.'"  *Id.* (citation omitted).  "Second, the injury must be beyond remediation."  *Id.*

Plaintiffs argue that they will suffer three forms of irreparable injury: (1) lost interest revenue from their inability to extend pawn loans to Service members and their dependents with interest rates exceeding 36 percent, (2) lost business and other compliance costs associated with the Final Rule's revised safe harbor, and (3) lost customer goodwill.

Before discussing these alleged harms, two initial matters must be addressed.  First, the parties dispute the impact on the irreparable injury analysis of Plaintiffs' delay in bringing this lawsuit.  The Final Rule was published in July 22, 2015, and Plaintiffs waited to file this suit until July 12, 2016.  Even then, Plaintiffs did not move for a preliminary injunction until September 2, 2016, roughly one month before the Final Rule was set to become applicable to pawnbrokers.  Additionally, several of the deficiencies Plaintiffs raise in this motion were not raised by Plaintiffs in their original complaint.  Defendants argue, and the Court finds reasonable, that this extended delay implies that the harm Plaintiffs allege they will suffer is not

as imminent and great as they suggest.  Defs.' Opp'n at 21; Defs.' Resp. to Min. Order, ECF No. 29 at 2.  The Court acknowledges Plaintiffs' explanation that the NPA first attempted to resolve this matter without litigation, and will accordingly not deny Plaintiffs' motion "based solely on a purported delay in bringing suit."  Pls.' Reply at 24-25; Decl. of Larry Nuckols, ECF No. 32 (explaining the NPA's efforts to address the Final Rule's "impacts on pawnbrokers" between its publication and the filing of this lawsuit).  Nonetheless, the Court finds that Plaintiffs' delay is at least a factor that "undermines [their] showing of irreparable injury."  *Biovail Corp. v. U.S. Food & Drug Admin.*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006); *see also, e.g.*, *Jack's Canoes & Kayaks, LLC v. National Park Serv.*, 933 F. Supp. 2d 58, 81 (D.D.C. 2013) ("Plaintiff's delay . . . undermine[s] any argument that its injury is of 'such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.'") (quoting *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 33 (D.D.C. 2012) (internal quotations omitted)).

Second, Plaintiffs acknowledge that the harms it claims are "chiefly economic."  Pls.' Mot. at 38.  As a general rule, "'in the absence of special circumstances . . . recoverable economic losses are not considered irreparable.'"  *Davis*, 571 F.3d at 1295 (quoting *Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995)).  The parties dispute how this rule applies where the economic losses at issue may be unrecoverable as a result of the Government's sovereign immunity.  Pls. Mot. at 38; Defs.' Opp'n at 22; Pls.' Reply at 17.  Nonetheless, both parties appear to agree that, at a minimum, an economic harm would have to be "certain, great and actual" to constitute irreparable injury.  *National Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52 (D.D.C. 2011).  The Court additionally finds that, even if Plaintiffs are correct that in this context they need not demonstrate that their economic injuries would "threaten[ ] the very existence of" their businesses, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985),

Plaintiffs must, at the very least, demonstrate that the economic harm they will suffer is "significant," *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012), and "sufficiently severe to warrant emergency relief," *Save Jobs USA*, 105 F. Supp. 3d at 115.  As discussed below, Plaintiffs largely fail to make this showing.

### 1.   Lost Interest Revenue

First, Plaintiffs argue that the "lost revenue that will result from applying the MAPR to pawn transactions," with Service members constitutes an irreparable injury.  Pls.' Mot. at 38.  At least with respect to the vast majority of pawnbrokers, Plaintiffs have not demonstrated that this economic injury is sufficiently severe to warrant injunctive relief.  This is not a case where Plaintiffs are prevented from engaging in their businesses altogether, or even regulated in their business transactions with respect to a considerable amount of their customers.  Both the record and Plaintiffs' declarations indicate that, for most pawnbrokers, only a tiny fraction of customers are likely to be covered by the MLA.  *See* Pls.' Mot., Ex. E (Decl. of Bob Moulton) at ¶ 3 ("I do not believe that my stores have many customers who are in the military or dependents of individuals who are in the military"); *id.*, Ex. F (Decl. of Kathy Pierce) at ¶ 3 ("Although I have never seen anyone in military uniform come to the Bloomington store, I estimate that we have one or two pawn customers who are members of the National Guard."); *id.*, Ex. G (Decl. of Jan Schneider) at ¶ 3 ("I estimate that fewer than 1% of our transactions are with active military members or their dependents."); *id.* Ex. J (Decl. of Wallace B. Boling) at ¶ 3 ("I estimate that 1-3% of our customers are active military or dependents of active military."); JA00503 (analysis in Final Rule indicating that "only approximately 2.5 percent of households in the United States include an active duty Service member").  Moreover, even with respect to these few customers, Plaintiffs are not prevented from extending pawn loans altogether; they are prevented only from

extending loans with interest rates exceeding *36 percent*. Whatever lost interest revenue Plaintiffs may suffer from this small fraction of their customers is not sufficiently great or severe to warrant injunctive relief.[18]

Plaintiffs make a stronger showing with regard to pawnshops located near military bases, but even this showing is flawed. Plaintiffs argue that, for pawn shops "with a high proportion of customers who are covered borrowers, the MLA interest rate threatens to put them out of business." Pls.' Mot. at 39. Plaintiffs claim that these members "are considering exiting the industry entirely and instead engaging only in buy-sell transactions." *Id*.

Out of the NPA's 1,505 members, Plaintiffs provide the declarations of only two pawnshop operators who operate near Military bases and accordingly estimate that they have, what the Court considers to be, a significant portion of customers who would be covered by the MLA. *Id*., Ex. D (Decl. of Chris Mathis) at ¶ 3 ("I estimate that approximately 75% of our customers are active military or dependents of active military"); *id*. Ex. I (Decl. of Gerald J. Howland Jr.) at ¶ 3 ("I estimate that approximately 30% of our customers are active military or dependents of active military"). Even to the extent that the harm to these few uniquely situated

---

[18] Plaintiffs also attempt to demonstrate irreparable injury to pawnshops by relying on the Department's estimate that the total compliance costs for all "creditors" to implement the Final Rule will be $106 million in the first year and $30 million each year thereafter. Defendants argue that this is improper because pawnbrokers are just one of many different types of affected "creditors" the Department considered, some small and some large, each of which are likely to have varying compliance costs. The Court agrees with Defendants that Plaintiffs cannot carry their burden of demonstrating what the economic harm to *pawnbrokers* will be based on numbers that apply to all creditors generally, big and small. Plaintiffs' sole response, that "it was the Department that based its calculations of the Final Rules' cost on estimates and averages across all creditors" and that "[i]f it was reasonable for the Department to perform its estimates in this manner, it is equally reasonable for Plaintiffs," Pls.' Reply at 21, is unavailing. In a motion for preliminary injunction, it is Plaintiffs burden to demonstrate with certainty and specificity the irreparable harm its members will face, and whether or not it was reasonable for the Department to estimate the cost of the Final Rule in this manner in no way alleviates Plaintiffs of that burden.

shops could be sufficient to justify the broad injunctive relief Plaintiffs request, the declarations

from these pawnshop owners do not provide the Court with sufficient information to determine

the severity of the economic harm they may face.  The record makes clear that interest from

pawn lending is only one of multiple sources of revenue for a pawnshop.  *See, e.g.*, Mathis Decl.

at ¶ 9 (stating that "we currently sell guns in addition to our pawn business," and guns are their

"most profitable items"); JA00279 (public comment of pawnbrokers explaining that pawn loans

are "[o]ne of the primary products offered" by their stores, but that pawnshops also buy items

"outright" and resell them).  Although these declarants estimate the amount of "interest revenue"

they stand to lose, they do not demonstrate what portion of their total revenue this constitutes.

The Court is therefore unable to determine the effect of these reductions in "interest revenue."

*See Apotex, Inc. v. Food & Drug Admin.*, No. CIV.A. 06-0627 JDB, 2006 WL 1030151, at *17

(D.D.C. Apr. 19, 2006), *aff'd and remanded,* 449 F.3d 1249 (D.C. Cir. 2006) (considering

amount of sales plaintiff claimed it would lose on a particular product in the context of plaintiff's

overall business revenue).

Moreover, even if the Court were to credit the declarants' claims that they may lose a

considerable amount of revenue if the Final Rule goes into effect, the Court would still find that

injunctive relief is improper.  If the Court were to grant the requested injunction, the "harm"

these few pawnshops fear would simply be shifted to Service members and their dependents who

would have to *pay* the high interest rates Plaintiffs ask to be able to continue to *charge*.

Accordingly, as discussed further below, the Court determines that the balance of hardships does

not favor granting the injunction.

### 2.  Compliance Costs Associated With Safe Harbor

Plaintiffs' argument that pawnshops will suffer various economic injuries as a result of

the "burden of implementing the safe harbor provision," Pls.' Mot. at 39, is more easily dealt

with.  Plaintiffs argue that pawnshops will lose business because customers will be "unable or

unwilling to provide a Social Security Number" as required to conduct a covered-borrower

check.  *Id.* at 40.  Plaintiffs further argue that, even if customers can provide their Social Security

numbers, checking the MLA Database will "drive up NPA members' expenses, cripple the speed

with which they are able to write loans, and expose them to potential liability."  *Id.*

    As an initial matter, these arguments fail because they are based on the false premise that

the Final Rule requires creditors to search the MLA Database.  It does not.  As the Department

stated when issuing the Final Rule, "nothing in the Department's final rule requires a creditor to

conduct a covered-borrower check."  JA00474.  Indeed, the Final Rule itself states that "[a]

creditor is permitted to apply its own method to assess whether a consumer is a covered

borrower."  JA00507.  Plaintiffs strenuously argue that the safe harbor procedure is *effectively*

"mandatory," because of "the severe civil and criminal penalties from noncompliance with the

MLA cap for covered borrowers."  Pls.' Mot. at 40 n.14.  But Plaintiffs ignore that there are a

number of other ways to lessen that risk, if not eliminate it altogether, without using a covered-

borrower check, such as continuing to use self-certifications.  Pawnshops could reasonably use

these other methods, especially given that violation of the MLA is only a criminal offense if the

creditor acts "knowingly," and a lender may not be held civilly liable if "the violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures

reasonably adapted to avoid any such error."  10 U.S.C. § 987(f)(5)(D).

    Moreover, even accepting the premise that pawnshops would be required to conduct

covered-borrower checks, Plaintiffs have not satisfied their burden to show that the economic

harm from conducting such checks is "certain, great [or] actual."  *Nat'l Min. Ass'n*, 768 F. Supp.

2d at 52.  Plaintiffs argue that, if required to use the MLA Database, they will lose business because customers will not tolerate the significant additional time required to run such checks or will be "unable or unwilling to provide a Social Security Number."  Frank Decl. at ¶ 7 ("I [ ] anticipate that many customers will be upset when we ask them to provide their SSN"); Schneider Decl. at ¶ 9 ("I also believe that the new rule will cause us to lose business because many of our customers are either unable or unwilling to provide a SSN."); Pierce Decl. at ¶ 9 (estimating that using MLA Database would take "5 minutes" and stating that "I believe that this delay would cause customers to become impatient and either leave or stop coming in altogether").  Plaintiffs also argue that they will lose retail business because employees that would normally assist retail customers will be tied up conducting lengthy covered-borrower checks.  Frank Decl. at ¶¶ 7, 9 ("I anticipate that this process will increase the time required to process a loan from 2-10 minutes to 15-20 minutes" and accordingly will "decrease our revenue from retail sales" because "pawn transactions will take up more of employees' time.").

These arguments are not particularly persuasive given the NPA's statement in its public comment that "[w]e have no doubt that service personnel can recite their Social Security Numbers . . . in a matter of seconds and from memory," JA00257, that "NPA members working on this comment report that the MLA Database works well," JA00258, and that one of its members commented that to search the MLA database "took less than 20 seconds from start to finish," JA00260.  More fundamentally, future harms based on the possible reactions of customers to covered-borrower checks are far too speculative to warrant granting injunctive relief.  *See Carabillo v. ULLICO Inc. Pension Plan & Trust*, 355 F. Supp. 2d 49, 55 (D.D.C. 2004), *aff'd*, 198 F. App'x 1 (D.C. Cir. 2006) ("such arguments of *possible* economic loss are clearly too speculative to be a proper basis upon which to find 'irreparable harm'"); *Power*

*Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 205 (D.D.C. 2005) (where plaintiffs were

"basically predicting" that certain harmful events might occur as a result of new regulation,

holding that "the plaintiff's claim of irreparable harm is far too speculative to merit injunctive

relief").

Also far too speculative is Plaintiffs' argument that pawnshops will be "expose[d] to

potential liability" in the event that their computers are "stolen" or "hacked."  Frank Decl. at ¶ 3

("I am concerned that [collecting Social Security numbers] will expose us to potential liability

under state or federal law in the event that the SSNs are stolen or our computer system is

hacked"); Moulton Decl. at ¶ 15 ("I am also concerned that collecting and safeguarding SSNs

will expose us to potential liability under state or federal law in the event that the SSNs are stolen

or our computer system is hacked").  Although the Court acknowledges that data breaches are

increasingly likely in today's world, the theoretical possibility of such breaches in the future is

clearly not certain enough to warrant injunctive relief.  *See Chaplaincy*, 454 F.3d at 297 ("the

injury 'must be both certain and great; it must be actual and not theoretical.'") (citation omitted).

### 3.  Customer Goodwill

Finally, Plaintiffs argue that the Final Rule threatens to undermine NPA members'

goodwill in the communities they serve" because it will "forc[e] pawn businesses to make loans

at unsustainably low and unprofitable rates, or to stop making loans to servicemen and

servicewomen altogether."  Pls.' Mot. at 41-42.

The Court finds that this argument fails for all of the reasons discussed above.  To the

extent Plaintiffs argue they will lose customer goodwill because they will be conducting

covered-borrower checks, Plaintiffs are not required to run such checks and any customer

dissatisfaction that might result from doing so is inherently speculative.  To the extent Plaintiffs

argue they will lose customer goodwill by not being able to extend high cost pawn loans to Service members and their dependents, this argument fails as well.  For most pawnshops, this harm is insufficient because the MLA applies to only a tiny fraction of their customers.  Even with respect to the few pawnshops that may have a high proportion of customers covered by the MLA, the notion that pawnshops will *lose* customer goodwill because they will not be able to charge Service members excessively high interest rates is simply not persuasive.

In sum, the Court finds that none of the economic harms Plaintiffs claim may befall them are sufficient to satisfy their burden of proving a likelihood of irreparable injury.  Moreover, as discussed below, even if Plaintiffs had shown that some pawnshops may lose a significant amount of revenue, the Court finds that the balance of hardships nonetheless weighs in favor of denying injunctive relief.

## C.  Public Interest and the Balance of Hardships

Finally, the Court finds that Plaintiffs have not shown that the public interest or the balance of hardships weigh in favor of granting injunctive relief.  "A party seeking a preliminary injunction must demonstrate both 'that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'"  *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting *Winter*, 555 U.S. at 20) (alteration in original).  "These factors merge when the Government is the opposing party."  *Id*. (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Plaintiffs argue that "neither the Department nor the public will be harmed by a preliminary injunction that 'largely seek[s] to preserve the status quo.'"  Pls.' Mot. at 42 (quoting *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014)).  In support, Plaintiffs point out that the Department itself already "delayed application of the MLA and

elimination of the self-certification safe harbor for a year." *Id*. at 42-43.  Plaintiffs argue that the

public interest in granting injunctive relief is significant because doing so would "maintain[ ]

Service members' access to non-recourse loans, and thus credit without the risks attendant to

other credit products," limit the opportunities for identity theft by limiting the collection of

Social Security numbers, and "protect[ ] small businesses from agency actions overlooking their

interests." *Id*. at 43.

For their part, Defendants contend that "[a]llowing the 2015 Rule to take effect as to

pawnbrokers is in the public interest because the 2015 Rule protects the Nation's military

families from financial instability[,] . . . promotes military readiness, and ensures uniform

availability of MLA rates across the full range of creditors utilized by covered borrowers."

Defs.' Opp'n at 32.  Defendants state that there is a "highly compelling government interest" in

maintaining military readiness, which would be impeded by an injunction in this case because

high cost loans are a significant problem for individual Service members and for the military as a

whole.  *Id*. at 34.  They dispute the notion that there is any benefit to Military families from a

"transaction in which they either forfeit a personal asset or, by Plaintiffs' own account, pay

interest at an annual percentage rate up to 240 percent," and argue that Service members have

various alternatives to high-cost pawn loans.   *Id*. at 33.

The Court acknowledges that pawnshops will suffer some degree of hardship if this

injunction is denied, but finds that the degree of that hardship is overstated by Plaintiffs.  As

discussed above, the economic injury Plaintiffs may suffer absent injunctive relief is limited and

speculative.  The Court also notes that Plaintiffs were given a year to come into compliance with

the Final Rule, which is significantly more time than the NPA indicated pawnshops would need

in its public comment.  JA00266.  Contrary to Plaintiffs' argument, this factor weighs heavily in

favor of denying, not granting, injunctive relief.  With regard to the interests of Service members, the Court finds unpersuasive Plaintiffs' argument that they or their dependents will be harmed if they lose access to pawn loans with interest rates exceeding 36 percent, and with APRs that could be as much as 240 percent.

The Court considers the hardship from further delaying implementation of the Department's rule to be significant.  Although Plaintiffs argue pawn loans are less harmful than other forms of high cost lending, they do not seriously dispute that pawn loans are indeed high cost.  The Court credits the Department's findings that high cost loans are a substantial and well-documented problem for Service members.  This Rule will help alleviate that problem and accordingly have a positive effect on military readiness, a weighty public interest.  *See Winter*, 555 U.S. at 24 ("We 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'") (quoting *Goldman v. Weinberger,* 475 U.S. 503, 507 (1986)); *Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 122 (D.D.C. 2005) (holding that the "interest in military readiness outweighs any speculative economic losses to the plaintiff").  For these reasons, the Court also finds that neither the public interest nor the balance of hardships favor a preliminary injunction.

## IV.    CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Plaintiffs' [17] Motion for Preliminary Injunction is DENIED.

Dated: October 3, 2016

                                    /s/
                                  COLLEEN KOLLAR-KOTELLY
                                  United States District Judge